## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**AMSTRONG CHAPAJONG,**<br><br>Defendant. | Case No.<br><br>**VIOLATION:**<br>18 U.S.C. § 1347 (Health Care Fraud)<br><br>**FORFEITURE:**<br>18 U.S.C. § 982(a)(7); 28 U.S.C. § 2461(c) |

# I N F O R M A T I O N

The United States Attorney charges that, at all times material to this Information, on or about the dates and times stated below:

### BACKGROUND

### D.C. Medicaid, Personal Care Aide, and Behavioral Health Regulatory Framework

1. Medicaid was a health insurance program established by Congress under Title XIX of the Social Security Act of 1965. In the District of Columbia (D.C.), Medicaid was jointly funded by the federal and D.C. governments. Medicaid provided health insurance coverage to D.C. residents whose incomes were below a certain financial threshold. Recipients of medical services covered by Medicaid were referred to as "beneficiaries." Medicaid was a "health care benefit program" as defined in 18 U.S.C. § 24(b) and a "Federal health care program" as defined in 42 U.S.C. § 1320a-7b(f). Under Medicaid, only medically necessary services were authorized to be reimbursed.

2. In the District of Columbia, home care agencies ("HCAs") were authorized to provide home care services, including personal care services, to D.C. Medicaid beneficiaries. Such

services were provided by personal care aides ("PCAs") and were intended to assist D.C. Medicaid beneficiaries in performing the activities of daily living, known as "ADLs." ADLs were defined to include the ability to get in and out of bed, bathe, dress, eat out, take medication prescribed for self-administration, and engage in toileting. Personal care services were billed in 15-minute increments, with each increment representing one (1) unit of service. D.C. PCA regulations required that the actual start and stop time of the service be used to calculate the duration of the service.

3. Pursuant to Section 12006 of the 21st Century Cures Act, all state Medicaid programs were required to implement an Electronic Visit Verification ("EVV") system to verify personal care services. EVV is a system that electronically captures details of home visits and services provided by caregivers while ensuring that beneficiaries are receiving the support they require, and the rendered services are billed accurately. By January 1, 2020, all PCA employees in the District of Columbia were required to utilize the EVV system to clock-in and clock-out when performing services at a beneficiary's home. The EVV system would in turn record the precise physical location of the PCA to help verify that the service was rendered.

4. In the District of Columbia, behavioral health services were administered by the D.C. Department of Behavioral Health ("DBH"). As the primary mental health authority in D.C., DBH was responsible for implementing and overseeing D.C.'s Mental Health Rehabilitative Services ("MHRS") program, a program covered by Medicaid. MHRS services were intended to assist eligible beneficiaries navigate and alleviate the impact of mental and behavioral health issues. Beneficiaries who received MHRS services were often referred to as "consumers."

5. Under the MHRS program, Medicaid covered and reimbursed standard behavioral health services, such as Community Support services. Community Support services included,

among other things, assistance and support for mental-health consumers in stressor situations, individual mental health interventions, assistance with increasing social support skills to enable consumers to ameliorate life stresses, and the development of mental health relapse prevention strategies. Community Support services were provided by a consumer's Community Support Worker ("CSW") under the auspices of a certified Medicaid Provider known as a Core Services Agency ("Provider").

6. In D.C., MHRS encounters with consumers were billed in "units," which were equivalent to 15 minutes of time providing services to a consumer. DBH regulations required the actual start and stop time of MHRS encounters to be used to calculate the duration of the service. For purposes of reimbursement, Medicaid authorized service encounters exceeding seven minutes to be rounded to the nearest whole unit.

7. Providers were required to maintain up-to-date records and to accurately document all MHRS encounters billed under the Provider's electronic medical records ("EMR") system. In D.C., Providers typically used an EMR platform called Credible. In order to be reimbursed by Medicaid for MHRS services provided to consumers, CSWs were required to document the service in Credible by inputting clinical encounter notes that included, among other information, consumer information, treatment notes, and dates and times of service. CSWs were authorized to conduct encounters in several ways. A "tele" visit indicated a telephonic or virtual encounter with a consumer. CSWs were required to validate the accuracy and authenticy of the services by signing their names.

8. Providers, as well as all employees of Providers, including CSWs and PCAs, were required to know, understand, and follow all federal and local laws, including Medicaid rules and regulations applicable in Washington D.C.

## COUNT ONE
### (Health Care Fraud)

9. The allegations contained paragraphs one through eight are realleged and incorporated as if fully set forth in this paragraph.

10. From at least on or about March 3, 2020, and continuing through at least on or about January, 28, 2022, in the District of Columbia and elsewhere, the defendant, **AMSTRONG CHAPAJONG** ("**CHAPAJONG**"), while working as both a PCA and CSW, did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the control of, the D.C. Medicaid program, a health care benefit program, as defined in 18 U.S.C. § 24(b), in connection with the delivery of and payment for health care benefits, items, and services, namely Personal Care Aide services and Mental Health Rehabilitative Services, all in violation of 18 U.S.C. § 1347.

### Acts in Execution of the Scheme and Artifice

11. On at least 451 days between March 3, 2020 and January 28, 2022, **CHAPAJONG** submittied materially false documents, that is, **CHAPAJONG** created claims that were sent to Medicaid for in-person personal care assistance services for one patient that overlapped with in-person or telephonic communiity support services for another patient. Medicaid paid approximately $461,369 for all shifts **CHAPAJONG** claimed to work on the 451 days where overlapping billing was submitted.

12. On or about the dates specified below, **CHAPAJONG** submitted the following materially false and fraudulent claims for reimbursement to D.C. Medicaid for PCA services he purported to provide in D.C., all of which were not supported by the relevant EVV data, and

4

overlapped with in-home community support services that **CHAPAJONG** claimed to provide to another beneficiary at a different location:

| Service Date | Client Name | Call In Latitude | Call In Longitude | Call Out Latitude | Call Out Longitude | Hours Claimed | EVV Locations |
|---|---|---|---|---|---|---|---|
| 4-Oct-2021 | J.B. | 38.93084 | -76.90106 | 38.93084 | -76.90104 | 8 | Maryland |
| 5-Oct-2021 | J.B. | 38.93084 | -76.90107 | 38.93086 | -76.90103 | 8 | Maryland |
| 6-Oct-2021 | J.B. | 38.93089 | -76.90105 | 38.93092 | -76.90118 | 8 | Maryland |
| 7-Oct-2021 | J.B. | 38.91703 | -76.92335 | 38.93088 | -76.90105 | 8 | Maryland |
| 12-Oct-2021 | J.B. | 38.9308 | -76.90145 | 38.91519 | -76.84528 | 8 | Maryland |
| 14-Oct-2021 | J.B. | 38.93087 | -76.90104 | 38.93084 | -76.90103 | 8 | Maryland |

(Health Care Fraud, in violation of 18 U.S.C. § 1347)

## FORFEITURE ALLEGATION

1. Upon conviction of the Federal health care offense alleged in Count One of this Information, defendant **CHAPAJONG** shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), any property, real or personal, which constitutes or is derived, directly and indirectly, from gross proceeds traceable to the commission of such offense.

2. If any of the property described above as being subject to forfeiture, as a result of of any act or omission of the defendant:

   (a) cannot be located upon the exercise of due diligence;

   (b) has been transferred or sold to, or deposited with, a third party;

   (c) has been placed beyond the jurisdiction of the Court;

   (d) has been substantially diminished in value; or

   (e) has been commingled with other property which cannot be subdivided without difficulty;

the defendant shall forfeit to the United States any other property of the defendant, up to the value of the property described above, pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b) and 28 U.S.C. § 2461(c).

          Respectfully submitted,

          JEANINE FERRIS PIRRO
          United States Attorney

By: _____
          Jason Facci (DC Bar 1027158)
          Special Assistant United States Attorney
          Fraud, Public Corruption, & Civil Rights Section
          601 D. Street, NW
          Washington, D.C. 20530
          (202) 252-7742
          Jason.Facci@usdoj.gov